```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                      BOWLING GREEN DIVISION

 3    UNITED STATES OF AMERICA,     ) Case No. 1:23-CR-6-GNS
                                    )
 4            Plaintiff,            )
                                    )
 5    vs.                           )
                                    )
 6    BENNETT M. CHRISTIAN,         )
                                    ) July 26, 2023
 7            Defendant.            ) Bowling Green, Kentucky

 8            *******************************************
                  TRANSCRIPT OF SUPPRESSION HEARING
 9             BEFORE HONORABLE H. BRENT BRENNENSTUHL
                   UNITED STATES MAGISTRATE JUDGE
10            *******************************************

11

12    APPEARANCES:

13    For United States:       Mark J. Yurchisin, II
                               U.S. Attorney's Office
14                             241 East Main Street, Suite 305
                               Bowling Green, KY 42101
15
      For Defendant:           Chastity R. Beyl
16                             Western Kentucky Federal
                                Community Defender, Inc.
17                             629 Fourth Avenue, Suite 200
                               Louisville, KY 40202
18
      [Defendant present.]
19

20

21
                          Terri L. Horton, RMR, CRR
22                         Official Court Reporter
                            133 U.S. Courthouse
23                              501 Broadway
                             Paducah, KY 42001
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

1    (Begin proceedings in open court at 11:36 a.m.)

2         DEPUTY CLERK:  Case Number 1:23-CR-6, *United States of*

3    *America vs. Bennett M. Christian*.  We're here for a suppression

4    hearing.

5         MR. YURCHISIN:  Good morning, Your Honor.  Mark

6    Yurchisin on behalf of the United States.

7         THE COURT:  Mr. Yurchisin.

8         MS. BEYL:  Good morning, Your Honor.  Chastity Beyl

9    for Mr. Christian.  He is present and seated to my right.

10        THE COURT:  Ms. Beyl.

11    Good morning, Mr. Christian.

12        THE DEFENDANT:  Good morning.

13        THE COURT:  All right.  Well, we're here for a

14    suppression hearing.  The burden rests with the United States in

15    this matter.  So how would you like to proceed, Mr. Yurchisin?

16        MR. YURCHISIN:  Well, Your Honor, one thing I do want

17    to cover is one of the arguments I made in my response was a

18    standing argument.  Obviously, we'll be pursuing that argument

19    again in post-hearing briefing, but it's -- to the best of my

20    knowledge, I don't think the defense is putting on any proof

21    today.

22    Is that correct?

23        MS. BEYL:  I'm not presenting any witness, but I think

24    I can get the proof as it relates to standing through evidence

25    that's already been presented as well as the witness the United

1   States is going to present.

2           THE COURT:  Okay.  Well, we'll make whatever record

3   the parties want to make today, and, of course, you'll have the

4   opportunity to submit post-hearing briefs if you wish.  Then

5   we'll consider all those issues together.

6           MR. YURCHISIN:  Okay, Your Honor.  Thank you.

7       So the United States does have a witness it is prepared to

8   call and testify in this matter.

9           THE COURT:  Okay.  Go right ahead.

10          MR. YURCHISIN:  The United States would call Deputy

11  Shauntel Mincy.

12      (DEPUTY SHAUNTEL MINCY, called by the Government, sworn.)

13          THE COURT:  If you'll have a seat right up there,

14  please.

15          THE WITNESS:  Thank you.

16                          DIRECT EXAMINATION

17  BY MR. YURCHISIN:

18  Q.  All right.  Can you state your name for the record, please?

19  A.  Shauntel Mincy.

20  Q.  And where are you employed?

21  A.  Simpson County Sheriff's Office.

22  Q.  And how long have you been employed there?

23  A.  A little over two years.

24  Q.  Okay.  And what do you do with the sheriff's office?  Like,

25  what role are you employed in?

1    A.   I'm a patrol unit.

2    Q.   Were you patrolling on February 2nd of this year?

3    A.   Yes, sir.

4    Q.   What area were you patrolling?

5    A.   The Mint Gaming Hall.

6    Q.   And tell the Court a little bit about what you were doing

7    during those patrols.

8    A.   I was just doing routine checks of license plates.

9    Q.   And did you find a vehicle which ultimately the defendant

10   was found to be in possession of?

11   A.   Yes, sir.

12   Q.   Okay.  Tell the Court a little bit about what you found with

13   that.

14   A.   Yes, sir.  I ran a tag that was on the back of a newer model

15   Acura, and the tag was ran through LINK/NCIC, which gives us our

16   database for license plates.  And whenever I ran this tag that

17   was on the back of the Acura, it came back not on file.

18   Therefore, I took a picture of the VIN in the windshield and ran

19   the VIN through LINK, and it came back confirmed stolen.

20   Q.   Okay.  So the tag that's on the vehicle, did it come back to

21   the Acura?

22   A.   No, sir.

23   Q.   And you just said this, I think, but were you able to

24   confirm that it was stolen through your checks?

25   A.   Yes, sir.

1    Q.  So what did you do after that?

2    A.  I asked Deputy Dexter Seward, also with the Simpson County

3    Sheriff's Office, to meet me at the parking lot so that we could

4    go inside to attempt to locate whoever was operating the

5    vehicle.

6    Q.  At that point, did you know who was operating that vehicle

7    or who drove it?

8    A.  No, sir.

9    Q.  So did you go in the casino?

10   A.  Yes, sir.

11   Q.  Or I should say the Mint Gaming Hall.  I'm sorry.

12   A.  Yes, sir.

13   Q.  And what did you do when you went inside?

14   A.  I made contact with the surveillance and security team and

15   asked them to replay the footage from whenever the vehicle

16   arrived in the parking lot.

17   Q.  And were you able to review that footage and determine who

18   drove the car?

19   A.  Yes, sir.

20   Q.  And what did you do from that point?

21   A.  Myself and Deputy Seward went through the Mint Gaming Hall

22   and attempted to locate the operator.

23   Q.  And was that operator the defendant?

24   A.  Yes, sir.

25   Q.  And did you find him in there?

1    A.  Yes, sir.

2    Q.  And were you wearing body cam during this?

3    A.  Yes, sir.

4    Q.  And was your interactions recorded on body cam?

5    A.  Yes, sir.

6    Q.  And I have here a thumb drive with some body cam footage on

7    it that I've provided to the defendant before.  Were you able to

8    review your body cam footage before court today?

9    A.  Yes, sir.

10   Q.  And is it a fair and accurate copy of the body cam footage

11   you have?

12   A.  Yes, sir.

13        MR. YURCHISIN:  Your Honor, after the hearing, I will

14   tender the thumb drive with Exhibits A, B, and C, which are

15   Ms. Mincy's body cam footage.

16        THE COURT:  Ms. Beyl, you've had an opportunity to

17   review these?

18        MS. BEYL:  Yes, sir.  I've actually referred to them

19   in my reply.

20        THE COURT:  Very well.

21        MR. YURCHISIN:  I'd move to admit them, Your Honor.

22   Thank you.

23   BY MR. YURCHISIN:

24   Q.  So I'm going to show a clip to you -- it's a short clip of

25   your body cam, Exhibit A -- and then I'll ask you some questions

1   about that.

2       (Video recording played.)

3   Q.   So, Deputy Mincy, did you see that footage?

4   A.   Yes, sir.

5   Q.   Okay.  So when you approached the defendant in the Mint

6   Gaming Hall, what did you do?

7   A.   I detained him.

8   Q.   Okay.  Now, did you handcuff him?

9   A.   Yes, sir.

10  Q.   Okay.  Explain to the Court why you did that.

11  A.   It's for officer safety, because he arrived in a stolen

12  vehicle, and we don't know who he is and what he could do.

13  Q.   Okay.  And did you inform him that he wasn't under arrest?

14  A.   Yes, sir.

15  Q.   And the Court saw the same clip we're discussing, but for

16  the sake of the record, was the defendant making any statements

17  to you at that point in time?

18  A.   Yes, sir.

19  Q.   Now, did you ask him any questions?

20  A.   Yes, sir.

21  Q.   What did you ask him?

22  A.   I asked him where he got the car from and how long he had

23  had it.

24  Q.   Okay.  And what were you trying to do at that point in time?

25  A.   Just determine the backstory of how he became -- how he came

1    in possession of the vehicle.

2    Q.  And what did you know about this car?

3        I know you mentioned it was stolen.  I think in the body cam

4    you said it was from Nashville.

5    A.  Yes, sir.

6    Q.  Did you know who the owners were?

7    A.  No, sir.

8    Q.  And then you walked him back out to the car?

9    A.  Yes, sir.

10   Q.  Why did you do that?

11   A.  To get him back to the vehicle where we could talk to him a

12   little more privately versus in the business.

13   Q.  And during the walk back, was he making any statements?

14   A.  Yes, sir.

15   Q.  And what did he say to you?

16   A.  Again, that he had gotten the car from Charlie and that he

17   could call Charlie and that he had had it for a couple months.

18   Q.  Did he ever tell you Charlie's last name?

19   A.  No, sir.

20   Q.  At any point did he ever offer a text message or anything to

21   evidence that he got this from Charlie?

22   A.  No, sir.

23   Q.  What did he tell you about Charlie?  Do you recall?

24   A.  That he was an older white guy that lived in Nashville.

25   Q.  So you got back to the vehicles, and we'll get ready to

1   watch a clip of that.  So what did you do once you got him out

2   of the casino?  Tell the Court.

3   A.  We walked back to the vehicles, and we was still trying to

4   figure out what exactly was going on with the whole situation.

5   And I then placed him in the back of the vehicle because he had

6   asked to sit inside the vehicle because he was cold.  It was

7   snowing.

8   Q.  Was he asking -- was he making any requests at this point in

9   time?

10  A.  He continuously asked to make a phone call to Charlie, his

11  people, I think at one time his mother.

12  Q.  Okay.  And you said he wanted to sit in the car because it

13  was cold?

14  A.  Yes, sir.

15  Q.  And did you put him in the car?

16  A.  Yes.

17  Q.  In the back of your car; is that right?

18  A.  Yes, sir.

19  Q.  And why the back of your car?

20  A.  Because I wasn't going to place him in a stolen vehicle.

21  Q.  Okay.  I'm going to show you a clip from Exhibit B, which is

22  being submitted to the Court, now.  Just a short clip.

23      (Video recording played.)

24  Q.  So where is this interaction taking place?

25  A.  At the backseat of my patrol vehicle.

1  Q.  Had you searched the Acura at any point at this time?

2  A.  No, sir.

3  Q.  And had you Mirandized him at any point yet?

4  A.  No, sir.

5  Q.  Were you arresting him yet?

6  A.  Right prior to this video, he had said -- I had made the

7  determination that he was going to jail for receiving stolen

8  property.

9  Q.  Okay.  Is that a felony in Kentucky?

10 A.  Yes, sir.

11 Q.  So at this point in time, were you going to search the

12 Acura?

13 A.  Yes, sir.

14 Q.  Did you tell him that?

15 A.  Yes, sir.

16 Q.  Maybe "search" is not the best term, but what did you tell

17 him?  Do you remember?

18 A.  I said I was going to look in the vehicle.

19 Q.  What were you going to be looking for?

20 A.  Owner information for the vehicle.

21 Q.  Did you indicate to him that you would be looking for

22 anything or trying to figure out who the owner was?

23 A.  I told him that the owners would want their vehicle back.

24 Q.  And I know the Court's seen the clip, but what was his

25 response to that?

1    A.   "They can have the car back.  I just want my stuff."

2    Q.   So what did you take that to mean?

3    A.   He wanted his property out of the vehicle.

4    Q.   Were you going to get his property for him?

5    A.   Yes, sir.

6    Q.   Did you ask him where his property was?

7    A.   Yes, sir.

8    Q.   And what did he say to you?

9    A.   "In the trunk."

10   Q.   And where were you going to -- what were you going to do

11   with the property once you got it?

12   A.   I was going to take it with him down to the jail.

13   Q.   Okay.  Where would it have gone had you not got it?

14   A.   It would have stayed with the vehicle.

15   Q.   Just sat in the vehicle?

16   A.   Yes, sir.

17   Q.   Now, at that point, was he making requests of you?

18   A.   Yes, sir.  He was continuing to ask to make multiple phone

19   calls.

20   Q.   Okay.  And in particular, did he ask you to call -- did he

21   want to call people?  I mean, did he ever give you a name of

22   anybody?

23   A.   I think he did say he wanted to attempt to call Charlie at

24   one point.

25   Q.   Did he ever ask for a drink?

1    A.  Yes, sir.

2    Q.  And I think in the clip we just saw, at one point he asked

3    to sit outside?

4    A.  Yes, sir.

5    Q.  So he wasn't getting to make a phone call, and you weren't

6    letting him sit outside.  I think you explained on the video,

7    but tell the Court why that was, you weren't letting him do

8    that.

9    A.  Because it's an officer safety issue.  If he makes a phone

10   call and tells where we're at, then it's possible that somebody

11   else could arrive on scene, and it just causes -- it's a

12   potential threat.

13   Q.  Is that something that you're trained on?

14   A.  Yes, sir.

15   Q.  And the defense mentioned in some of her briefing about did

16   he ever ask for a lawyer?

17   A.  He asked to make a phone call to a lawyer.

18   Q.  Okay.  At the time, did you think that was a legitimate

19   request?

20   A.  No, sir.

21   Q.  Now, why was that?

22   A.  Because he was continuing to just try to make multiple phone

23   calls.

24   Q.  Now, were you interrogating him at this point?

25   A.  I was asking him investigatory questions.

1   Q.  Okay.  And then you were -- and then after this interaction,

2   what did you do?

3   A.  I went to the trunk of the vehicle to get his belongings out

4   of it.

5   Q.  Okay.  How would you describe prior to going to the car the

6   interaction with the defendant?  I mean, was he ...

7   A.  He wasn't listening to verbal commands to get inside the

8   vehicle.  He was continuously rambling.

9   Q.  Okay.  How did you -- so you go to the Acura then at this

10  point.  What did you do?

11  A.  I used the key fob to pop the trunk.

12  Q.  Okay.  And what was in the trunk?

13  A.  A lot of belongings.  Shoes, clothes.

14  Q.  And is that where he indicated that his stuff would be?

15  A.  Yes, sir.

16  Q.  When you did that, did you notice anything else?

17  A.  Yes, sir.

18  Q.  And what was that?

19  A.  When we popped the trunk, a strong odor of marijuana was

20  coming from inside the vehicle.

21  Q.  Now, before that time, had you ever smelled any marijuana?

22  A.  No, sir.

23  Q.  And you've been an officer roughly two years.  Have you ever

24  smelled marijuana before?

25  A.  Yes, sir.

1   Q.  Have you ever had citations before for people with

2   marijuana?

3   A.  Yes, sir.

4   Q.  Seized it as any evidence?

5   A.  Yes, sir.

6   Q.  And, you know, based off your impression at the time, where

7   was that odor of marijuana emanating from?

8   A.  Inside the white Acura.

9   Q.  Okay.  So then what did you do?

10  A.  At that time, we searched the vehicle.

11  Q.  And where did you go?

12  A.  To the passenger side of the vehicle.

13  Q.  And what did you do when you started searching?

14  A.  When I first opened the passenger side, I found a grocery

15  bag that was in the center console.  When I saw what was inside

16  the bag, I looked down and realized my body cam wasn't on.  So

17  at that time, that's when I turned my body cam on.

18  Q.  Okay.  So that was going to be one of my questions.  There

19  appears to be a gap between this segment of the videos to where

20  the body cam starts during the search of the vehicle.

21  A.  Yes, sir.

22  Q.  In particular, I don't think we see where you got in the

23  trunk to get his belongings the first time.  Is that accurate or

24  not accurate?

25  A.  Yes, sir.  It's not on camera.

1    Q.   Okay.  But when did you turn it back on?

2    A.   When I found the suspected illegal drugs in the center

3    console of the vehicle.

4    Q.   And why did you go to the center console?

5    A.   That is a common place for owners to keep registration or

6    insurance information.

7    Q.   So you smelled marijuana; is that safe to say?

8    A.   Yes, sir.

9    Q.   At that point, were you still looking for evidence of the

10   stolen vehicle, or had the nature of the case changed?

11   A.   It was still both.

12   Q.   Have you ever done a traffic stop before?

13   A.   Yes, sir.

14   Q.   Based on your training and experience, just to clarify, is

15   the console somewhere vehicle owners will sometimes keep

16   registration, vehicle ownership paperwork?

17   A.   Yes, sir.

18   Q.   Where is another place they might likely keep that?

19   A.   The glove box.

20   Q.   Did you ever search the glove box in this case?

21   A.   Yes, sir.

22   Q.   What did you find in the glove box of any value?

23   A.   There was a Tennessee registration plate that was expired

24   folded up -- or shoved into the glove box.

25   Q.   Was it a license plate or --

1    A.  Yes, sir.

2    Q.  When you found that license plate, what did you do?

3    A.  I ran it through dispatch.

4    Q.  And what did they report back to you?

5    A.  They advised it was -- it was supposed to be on a red Nissan

6    that belonged to a Charles Larue out of Nashville.

7    Q.  It didn't belong to the Acura?

8    A.  No, sir.

9    Q.  After you found the license plate, what did you do?

10   A.  I continued searching through the vehicle.

11   Q.  Did you ever go back and approach the defendant again?

12   A.  I don't remember exactly when, but yes, sir.

13   Q.  Now, at this point -- or I should ask -- let me start over

14   and ask that question differently.  Does the sheriff's office or

15   Simpson County have a policy and procedures manual?

16   A.  Yes, sir.

17   Q.  And are you familiar with that?

18   A.  Yes, sir.

19        MR. YURCHISIN:  And if I can put this up on the screen

20   for her, please.

21      And, Your Honor, this is going to be Exhibit E on the thumb

22   drive.  I apologize.

23   Q.  Can you identify this document for the Court?

24   A.  Yes, sir.  It's our impound and towing policy for the

25   Simpson County Sheriff's Office.

1   Q.  Before I go through this policy, I want to ask you, were you

2   going to tow the Acura at any point in time?

3   A.  Yes, sir.

4   Q.  And why was that?

5   A.  Because it's a stolen vehicle, and it's policy to tow it to

6   the impound lot.

7   Q.  And I'm going to turn to page 5 of this chapter that's in

8   the policy manual.  And you just mentioned it, but is there a

9   policy on stolen vehicles --

10  A.  Yes, sir.

11  Q.  -- or a statement on it?

12      Now, with regards to stolen vehicles, what's the office

13  policy on searching them, or what were you aware of?

14  A.  We can search for the regist- -- or the owner's information

15  and then as evidence gives you reasons to process.

16          MR. YURCHISIN:  Okay.  And that's all I need off the

17  screen.  Thank you.

18  Q.  So once the vehicle was towed, would you have followed it to

19  the impound lot and searched it?

20  A.  Yes, sir.

21  Q.  Okay.  I bring that up now because when you go back to meet

22  with the defendant, did you mention the car would be towed?

23  A.  I can't recall.

24  Q.  Okay.  Did you go back to see the defendant after you had

25  looked in the car?

1   A.  Yes, sir.

2   Q.  Okay.  Did you Mirandize him at that point in time?

3   A.  Yes, sir.

4   Q.  And did he agree to speak with you at that point in time?

5   A.  Yes, sir.

6   Q.  Do you recall what you asked him?

7   A.  I asked him about the suspected illegal drugs that were

8   found inside the vehicle.

9       Sorry.

10  Q.  Sorry.  Did he say anything about the drugs?

11  A.  He said he didn't know they were in there.

12  Q.  Okay.  Did you bring up the license plate to him?

13  A.  Yes, sir.

14  Q.  Okay.  Tell the Court what happened with the license plate

15  you found.

16  A.  I asked if Charlie Larue was who he got it from, and he

17  advised that he thinks that was who it was.

18  Q.  Okay.  And I don't mean to mince words, but -- or maybe

19  that's not the correct term.  I don't want to nitpick, but who

20  was the first person that brought up Charles Larue -- the last

21  name Larue, I should say?

22  A.  I did.

23  Q.  Did the defendant ever bring that up on his own?

24  A.  No, sir.

25  Q.  What was the name he just kept using?

1   A.   Charlie.

2   Q.   All right.  Did he ever tell you how much he paid Charlie to

3   borrow this vehicle?

4   A.   $200.

5   Q.   I'm sorry?

6   A.   $200.

7   Q.   And were you ever -- after this event, were you able to get

8   a full theft report on the stolen vehicle?

9   A.   Yes, sir.

10   Q.   Okay.  And I'm going to show you a copy of it.  I believe

11   the defendant attached it as a copy -- as an exhibit to his

12   original motion.

13        Do you recognize what I'm showing you right now?

14   A.   Yes, sir.

15   Q.   I'm going to turn to the second page.  Do these reports have

16   a value of the vehicle, or can you read off this report what the

17   estimated value of the vehicle was?

18   A.   It's too small of print for me to be able to read it.

19   Q.   Let me see if I can bring it closer.

20        MR. YURCHISIN:  May I just approach the witness and

21   show her, Your Honor?

22        THE COURT:  Certainly.

23        MR. YURCHISIN:  Thank you.

24   A.   It's $25,000.

25   Q.   So in your citation -- and did you write a citation in this

1  case?

2  A.  Yes, sir.

3  Q.  And I think that was also tendered as part of the original

4  motion.  I have a copy of your citation here.  And in your

5  citation, you mention that you were obtaining the defendant's

6  belongings from his car because he asked you to get them; is

7  that accurate?

8  A.  Yes, sir.

9  Q.  And you've now had a chance to go back and look at your body

10  cam.  And I believe it's shortly after the second clip I played

11  you, but was there ever a time where he at one point said, "I

12  don't want my stuff now"?

13  A.  Yes, sir.

14  Q.  Okay.  Tell the Court what happened there though.

15  A.  In the -- while I was trying to get him to swing in, I had

16  to -- he continued to not comply, so I had to raise my voice and

17  physically push him in.  And in the heat of the moment, I didn't

18  hear him say that he didn't want his stuff.

19  Q.  So when you opened the trunk, did you think that he had

20  still asked you to get his stuff?

21  A.  Yes, sir.

22  Q.  Now, when you Mirandized him, what -- I mean, did you tell

23  him anything about getting in the car?

24  A.  Yes, sir.

25  Q.  What did you tell him?

1  A.  I told him whenever I opened the trunk to get his stuff out

2  that I smelled the odor of marijuana.

3  Q.  Did you mention to him that you were doing that because he

4  wanted you to get his stuff?

5  A.  I can't recall exactly what I said.

6       MR. YURCHISIN:  Let's go ahead and -- just go ahead

7  and do that.  That's fine.

8     (Video recording played.)

9  Q.  Now, after having the opportunity, is that still your video?

10 A.  Yes, sir.

11 Q.  Okay.  All right.  At any point when you approached him this

12 time, did he ever say he never asked you to get in the car?

13 A.  No, sir.

14 Q.  Okay.  At that point, did you still think he had asked you

15 to get in the car and get his stuff?

16 A.  Yes, sir.

17 Q.  Now, I've asked you a bunch of questions about when you knew

18 the vehicle was stolen.  You mentioned to him on the video that

19 you searched the car because when you opened the trunk you

20 smelled marijuana.  This question may get asked of you, but why

21 rely on that rather than the stolen vehicle?  What were you

22 thinking at the time?

23 A.  I don't understand your question.

24 Q.  Convoluted question.  I'm sorry.

25    Your documentation from your citation lists the reason you

1    searched the vehicle due to the odor of marijuana you smelled at

2    the time --

3    A.  Yes, sir.

4    Q.  -- is that correct?

5    A.  Yes, sir.

6    Q.  Why did you list that as your reason for searching the

7    vehicle?

8    A.  It's a probable cause search with the odor of marijuana.

9    Q.  And is that based on your training and experience?

10   A.  Yes, sir.

11   Q.  Did you know the car was stolen, though, at that time?

12   A.  Yes, sir.

13   Q.  And did you know who the owners were?

14   A.  No, sir.

15   Q.  And had you seen anything at that point in time to -- that

16   would even indicate who the real owners were?

17   A.  No, sir.

18   Q.  Was that car registered to Charles Larue?

19   A.  No, sir.

20   Q.  And were you able to verify that after this event?

21   A.  Yes, sir.

22   Q.  Who was the car actually registered to?

23   A.  It came back to GEICO.

24   Q.  Okay.  And we had looked previously at the theft report from

25   Nashville.  Was the name on that report Charles Larue?

1    A.   No, sir.

2            MR. YURCHISIN:  Thank you, Deputy.  That's all the

3    questions I've got.  I may have some more after Ms. Beyl is

4    done.

5            THE WITNESS:  Yes, sir.

6                            CROSS-EXAMINATION

7    BY MS. BEYL:

8    Q.   Good afternoon, Deputy Mincy.  My name is Chastity Beyl.  I

9    have a few follow-up questions, and I want to clarify a couple

10   of things from the body cam videos, okay?

11   A.   Yes, ma'am.

12   Q.   There was reference in the arrest citation and on the body

13   cams about some purported smoked marijuana cigarettes in the

14   vehicle; correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  And where were these items located?

17   A.   There were some in the floorboard as well as in the ashtray.

18   Q.   Okay.  I'm going to show you for clarification real quick --

19   these are photos that were provided to me in discovery, and what

20   I am assuming is that reference to the marijuana cigarettes is

21   this Number 6 here; is that correct?

22   A.   Yes, ma'am.

23   Q.   Did you fill these out?

24   A.   Yes, ma'am.

25   Q.   Okay.  And these are the marijuana cigarettes that you

1  referred to; correct?

2  A.  Yes, ma'am.

3  Q.  Were these recovered from the floorboard or in the ashtray?

4  A.  I can't tell you which one was from which.

5  Q.  Okay.  Do we have any photographs from inside the vehicle

6  depicting the purported marijuana cigarettes on the floorboard?

7  A.  No, ma'am.

8  Q.  Okay.

9       MS. BEYL:  Your Honor, I'm going to mark this as

10  defendant's suppression hearing Exhibit A, and I would move to

11  introduce that.

12       MR. YURCHISIN:  No objection, Your Honor.

13  Q.  Now, you testified on direct that when you approached the

14  vehicle or from outside the vehicle, you could not detect the

15  odor of marijuana; correct?

16  A.  Yes, ma'am.

17  Q.  So upon observation of the purported marijuana cigarettes

18  inside the vehicle, without being able to smell them, you

19  couldn't tell if they were tobacco or if they were marijuana; is

20  that fair to say?

21  A.  Yes, ma'am.

22  Q.  Okay.  Do you know if these items -- that Exhibit Number 6

23  that I just showed you, do you know if it's been sent off for

24  any type of testing or if we have any lab results from that?

25  A.  I'm not aware, ma'am.

1    Q.   Did you make any request to have those tested?

2    A.   Not specifically the marijuana cigarettes, no, ma'am.

3    Q.   Okay.  When you say "not specifically the marijuana

4    cigarettes," did you ask to have the marijuana cigarettes

5    tested?

6    A.   No, ma'am.

7    Q.   Okay.  All right.  I want to walk you back to whenever you

8    first encountered the Acura.  My understanding is that you ran

9    the license plate first.  You couldn't get a hit on that;

10   correct?

11   A.   Yes, ma'am.

12   Q.   And then you ran the VIN; correct?

13   A.   Yes, ma'am.

14   Q.   And then you found out through I believe it was two separate

15   sources, LINK and NCIC, that the vehicle had been reported

16   stolen; is that correct?

17   A.   Yes, ma'am.

18   Q.   At that point in time, you did have information regarding

19   when the vehicle was stolen; correct?

20   A.   No, ma'am.

21   Q.   You did not have information of when the vehicle was stolen

22   when you encountered Mr. Christian inside the Mint Gaming Hall?

23   A.   Walking outside is when we found out when it was stolen.

24   Q.   Okay.  Do you recall making any statements to him that --

25   inside the Mint Gaming Hall it had been stolen in May of 2022?

1    A.   I believe that was when we was walking out.

2    Q.   Okay.  So as you're walking out.  So it sounds like, then,

3    you get a hit that the vehicle was stolen and then you're being

4    fed more information about the specifics of the stolen vehicle;

5    is that correct?

6    A.   Yes, ma'am.

7    Q.   Okay.  So prior to getting to the police truck, you had

8    information that the vehicle had been stolen in May of 2022;

9    correct?

10   A.   Yes, ma'am.

11   Q.   Approximately eight months prior; correct?

12   A.   Yes, ma'am.

13   Q.   Okay.  Then you also had information at that point in time

14   that it had been stolen out of Nashville; correct?

15   A.   Yes, ma'am.

16   Q.   And I believe you also at that point in time were able to

17   determine what the correct license plate or tag number should

18   have been; correct?

19   A.   I can't recall.

20   Q.   Okay.  Do you recall getting that information, though, while

21   you were there on scene?

22   A.   Not specifically, no, ma'am.

23   Q.   Okay.  You testified earlier you've reviewed the body cam

24   videos; correct?

25   A.   Yes, ma'am.

1    Q.  You don't have any reason to dispute the information that's

2    contained therein; correct?

3    A.  No, ma'am.

4    Q.  If that information is conveyed on that body cam video, you

5    have no reason to dispute that; correct?

6    A.  Yes, ma'am.

7    Q.  Okay.  So to your knowledge, based upon the information that

8    you had at the scene, there was nothing that indicated to you

9    that Mr. Christian fit the description of the individual that

10   would have stolen the vehicle; correct?

11   A.  Yes, ma'am.

12   Q.  That stole the vehicle.

13   A.  Well, no, ma'am.  I'm agreeing with you.

14   Q.  Mr. Christian certainly wasn't a named suspect in that

15   stolen vehicle, correct, for stealing the vehicle?

16   A.  No, ma'am.

17   Q.  Okay.  You didn't have any information that he was in the

18   area of -- Nashville, Tennessee, that's where it was stolen;

19   correct?

20   A.  Yes, ma'am.

21   Q.  Okay.  You didn't have any information that Mr. Christian

22   was in the area of Nashville, Tennessee, in May of 2022;

23   correct?

24   A.  No, ma'am.

25   Q.  Okay.  In fact, Mr. Christian told you multiple times that

1   he did not steal the vehicle; correct?

2   A.  Yes, ma'am.

3   Q.  He never made any admissions to you that he had knowledge

4   that the vehicle was stolen; correct?

5   A.  No, he didn't.

6   Q.  Okay.  And we have talked a lot about him naming this

7   individual by the name of Charlie as who he got the vehicle

8   from; correct?

9   A.  Yes, ma'am.

10  Q.  And he was able to provide you with Charlie's name, he also

11  provided you with the amount of money that he paid in exchange

12  for obtaining this vehicle; correct?

13  A.  Yes, ma'am.

14  Q.  No evidence that you able to collect or to obtain that

15  contradicted what Mr. Christian had told you as to how he came

16  into possession of this vehicle; correct?

17  A.  I asked if he had messages, and he said he didn't.

18  Q.  Okay.  But, again, there was no evidence that contradicts

19  that he had gotten the vehicle from Charlie or paid the $200;

20  correct?

21  A.  Yes, ma'am.

22  Q.  Did you ever at any time contact Charlie, per the request of

23  Mr. Christian, to determine if he had indeed gotten the vehicle

24  from him?

25  A.  No, ma'am.

1   Q.  Mr. Christian did make requests to contact Charlie; correct?

2   A.  Yes, ma'am.

3   Q.  I know that you were in possession of the phone and he was

4   not allowed to make any phone calls, but did you make any

5   efforts to get the information from Mr. Christian to contact

6   Charlie or Charles Larue?

7   A.  No, ma'am.

8   Q.  We saw earlier on the body cam video that when you first

9   encountered Mr. Christian, you did place him in handcuffs;

10  correct?

11  A.  Yes, ma'am.

12  Q.  He was handcuffed behind his back; correct?

13  A.  Yes, ma'am.

14  Q.  From that initial encounter until the point that he was

15  placed under arrest, Mr. Christian was always either in your

16  presence or in the back of the police vehicle; correct?

17  A.  Yes, ma'am.

18  Q.  And at no time during that time period was he free to leave;

19  correct?

20  A.  Yes, ma'am.

21  Q.  Okay.

22  A.  No, ma'am.

23  Q.  He was not free to leave; correct?

24  A.  Yes, ma'am.

25  Q.  Okay.  Whenever he was placed inside of the police vehicle,

1    once that door is closed, is that vehicle, I guess -- I don't

2    want to say rigged, but is it manufactured in such a way that an

3    individual in the backseat can't get out?

4    A.  Yes, ma'am.

5    Q.  Okay.  It's for detaining suspects; correct?

6    A.  Yes, ma'am.

7    Q.  And so once Mr. Christian was placed in the back of that

8    vehicle, he was not able to leave that vehicle; correct?

9    A.  Yes, ma'am.

10   Q.  Okay.  From the time that he was handcuffed until you-all

11   left the scene, he remained handcuffed the entire time; correct?

12   A.  Yes, ma'am.

13   Q.  Okay.  And as we saw on multiple occasions in the body cam

14   videos, he was never allowed to make any phone calls; correct?

15   A.  Yes, ma'am.

16   Q.  Okay.  As we saw from the videos -- and I think that you

17   testified to this fact -- when you had the initial encounter,

18   when you first handcuffed Mr. Christian, you did not Mirandize

19   him; correct?

20   A.  Correct.

21   Q.  Okay.  Now, when you were going into the Mint Gaming Hall,

22   your intention was to find the individual that was in the

23   vehicle that had come back stolen; correct?

24   A.  Yes, ma'am.

25   Q.  You were investigating a stolen vehicle at that point;

1   correct?

2   A.  Yes, ma'am.

3   Q.  And it came to your attention through review of the security

4   video that Mr. Christian was the individual that had been in

5   that vehicle; correct?

6   A.  Yes, ma'am.

7   Q.  Okay.  And whenever you encountered Mr. Christian, you did

8   ask him questions about how he came into possession of that

9   particular vehicle; correct?

10  A.  Yes, ma'am.

11  Q.  And how long he had come into possession; correct?

12  A.  Yes, ma'am.

13  Q.  And these were questions that were asked of him, it was not

14  information that was initially volunteered by him; correct?

15  A.  Yes, ma'am.

16  Q.  We see on the video that you were able to retrieve a cell

17  phone and key fob from Mr. Christian's pockets; is that correct?

18  A.  Yes, ma'am.

19  Q.  And I can't tell from looking at the videos, but who stayed

20  in possession of that key fob?

21  A.  I did.

22  Q.  Okay.  It was never given to Deputy -- is it Seward?

23  A.  Yes, ma'am.

24  Q.  Seward?  Was it ever given to him?

25  A.  I don't believe so.  I think I kept it the entire time.

1    Q.  Okay.  Just so I can make the record clear -- because we

2    jumped around a little bit once Mr. Christian was placed in the

3    back of the police vehicle.  You take Mr. Christian from the

4    Mint Gaming Hall.  You and Deputy Seward escort him out to the

5    truck or the area of the truck and the Acura; correct?

6    A.  Yes, ma'am.

7    Q.  Okay.  And then Mr. Christian is placed almost immediately

8    inside the rear of the police truck; correct?

9    A.  At his request, yes, ma'am.

10   Q.  And then once he is placed inside the rear of the police

11   truck, he is not Mirandized at that point; correct?

12   A.  No, ma'am, he's not.

13   Q.  Okay.  And then a conversation ensues between the two of you

14   where you're asking more questions about how he came into

15   possession of the vehicle; correct?

16   A.  Yes, ma'am.

17   Q.  Okay.  And it's during this time period where you advise him

18   that you're going to look into the vehicle; correct?

19   A.  Yes, ma'am.

20   Q.  And that's whenever the initial request is to get his items

21   out of the vehicle; correct?

22   A.  Yes, ma'am.

23   Q.  Okay.  And then while you're having this conversation or

24   shortly thereafter, Mr. Christian does make a request for an

25   attorney; correct?

1    A.   He requests a call, yes.

2    Q.   He what?

3    A.   He requested a call.

4    Q.   A call to his attorney?

5    A.   Yes.

6    Q.   You had testified earlier that you didn't think it

7    constituted a legitimate request.  What do you mean by that?

8    A.   Due to him asking multiple times continuously to make phone

9    calls to multiple different people, I believed it was just him

10   rambling.

11   Q.   Okay.  What do you think constitutes a legitimate request

12   for an attorney or to talk to an attorney?

13   A.   At that point, he hadn't even been informed that he was

14   under arrest.  He was still just being detained.

15   Q.   He was being advised, though, that he was in a stolen

16   vehicle; correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  And I think you testified on direct earlier he was

19   being told that he was going to be charged with possession of a

20   stolen vehicle; correct?

21   A.   After that, yes, ma'am.

22   Q.   Okay.  But, again, when he did request a call to an

23   attorney, that request was not honored; correct?

24   A.   Yes, ma'am.

25   Q.   It was not honored?

1   A.   Not at that time, no, ma'am.

2   Q.   Okay.  Was he ever allowed to call an attorney from the

3   scene?

4   A.   No, ma'am.

5   Q.   Was he ever able to have access to a phone to contact an

6   attorney on the scene?

7   A.   No, ma'am.

8   Q.   Going to the conversation, again, about his possessions in

9   the vehicle, you never requested of Mr. Christian if you could

10  search the vehicle.  There wasn't a request for consent to

11  search the vehicle; correct?

12  A.   No, ma'am.  I never asked that, no, ma'am.

13  Q.   Right.  You told him you were going to search the vehicle;

14  correct?

15  A.   I said I was going to look in the vehicle.

16  Q.   Okay.  Looking in the vehicle means, again, you were going

17  to access the interior of the vehicle?

18  A.   Yes, ma'am.

19  Q.   Okay.  And so because you never asked him for consent to

20  search the vehicle, he never gave an affirmative response that

21  you could search the vehicle; correct?

22  A.   I wasn't asking for consent to search though.

23  Q.   Correct.  And because you weren't asking for consent, he did

24  not give consent to search the vehicle; correct?

25  A.   Yes, ma'am.

1    Q.  Going to the location of the items in the vehicle, I do want

2    to clarify that, because as you stated before, your body camera

3    was off whenever you looked in the center console.  At what

4    point prior to that had you turned the body camera off?

5    A.  Right before I popped the trunk.

6    Q.  Okay.  What was your reasoning for doing so?

7    A.  At that point, I was just getting his belongings out.

8    Q.  Okay.  Now, you said earlier on direct that at the point

9    that you popped the trunk, that's whenever you detected the odor

10   of marijuana; correct?

11   A.  Yes, ma'am.

12   Q.  And that gave you, in your opinion, probable cause to search

13   the vehicle; correct?

14   A.  Yes, ma'am.

15   Q.  Upon the odor of marijuana and having what you consider

16   probable cause to search the vehicle, you did not turn your body

17   camera back on?

18   A.  No, ma'am.

19   Q.  Okay.  But your intent at that point was to search the

20   vehicle?

21   A.  I was already going to be getting inside the vehicle before

22   that.

23   Q.  Okay.  So going to the items located in the vehicle -- oh,

24   let me step back real quick.  The smell of marijuana, are you

25   referencing -- is it smoked marijuana?  Is it green marijuana?

1    Can you describe for the Court exactly what the odor of

2    marijuana was?

3    A.   It smelled like marijuana.  I don't know what you're asking.

4    Q.   Did it smell like it had been smoked?

5    A.   No, ma'am.

6    Q.   Did it smell like it was green in baggie?

7    A.   Yes, ma'am.

8    Q.   What was the smell?

9    A.   It smelled like unburnt marijuana.

10   Q.   Okay.  Yeah.  That's what I was getting to.  I think you

11   just said it better.

12       So when you go to search the vehicle, you're in the trunk,

13   and then from the trunk, where do you go?  What side do you

14   access the passenger compartment of the vehicle?

15   A.   The passenger side.

16   Q.   The passenger side.

17       To open the passenger side door, did you have to use the key

18   fob again?

19   A.   I hit the unlock button.

20   Q.   Okay.  So you unlock the vehicle with the key fob, and then

21   you open up the passenger side door.  And then where do you

22   search at that point?

23   A.   Like first?

24   Q.   Uh-huh.

25   A.   The center console.

1    Q.  The steering console?

2    A.  The center console.

3    Q.  The center console.

4        And when we talk about the center console -- and, again,

5    it's not clear from the body cam videos -- is the center console

6    one of those that has a cover on it so you have to, like, pop it

7    up?

8    A.  Yes, ma'am.

9    Q.  Okay.  And so do you have to use, like, a handle to pop it

10   up?

11   A.  It's the button you press to pop the center console open.

12   Q.  Okay.  So when we talk about the drugs that were found in

13   the grocery bag, they're not just sitting in the open in, like,

14   the center console cups or the center console area; correct?

15   A.  Correct.

16   Q.  They're within the well of the center console once you open

17   it; correct?

18   A.  Yes, ma'am.

19   Q.  Okay.  So when you open the center console, is there any

20   type of tray there, or is it, like, a well -- like a deep well

21   within the console?

22   A.  It was a deep well.

23   Q.  Okay.  And where exactly was the grocery bag located in that

24   well?  Was it at the bottom?  Was it sitting on the top?

25   A.  It was visible as soon as you opened it.  It was just right

1    in the middle.

2    Q.   Okay.  Were there any papers on top of it or underneath it?

3    A.   Not that I can recall, no, ma'am.

4    Q.   Okay.  And was -- the grocery bag itself, was it open or was

5    it closed up?

6    A.   I don't recall.

7    Q.   Okay.  Did you take any photos memorializing where and how

8    you found that grocery bag in the center console?

9    A.   No, ma'am.

10   Q.   Okay.  And then upon observation of this grocery bag, you

11   pulled that out of the center console?

12   A.   Yes, ma'am.

13   Q.   Okay.  And that's whenever you turned on your body cam

14   video?

15   A.   After I placed it in the seat and saw what was inside --

16   Q.   Okay.

17   A.   -- is when I turned my video on.

18   Q.   So you place it in the seat, open it up, you see what's

19   inside, that's when you turn back on the body cam video?

20   A.   Yes, ma'am.

21   Q.   Okay.  There was reference in the arrest citation that

22   Deputy Seward had to lift up the radio compartment to find a

23   baggie of marijuana, and it wasn't clear to me exactly what he

24   was lifting up and where he was looking.  Can you explain what

25   that area is and how he accessed that area?

1   A.  Yes, ma'am.  There was a factory compartment that the front

2   side just came up, and it was a factory-installed compartment,

3   and that was where the suspected marijuana as well as pills were

4   found.

5   Q.  And were they in any type of containers?  Were there any

6   other items within that compartment?

7   A.  They were in clear plastic baggies.

8   Q.  Okay.  Any other items found within that compartment?

9   A.  No, ma'am.

10  Q.  Any paperwork within that compartment?

11  A.  Not to my knowledge, no, ma'am.

12  Q.  And, again, those items weren't, like, in a grocery bag or

13  some other type of container?

14  A.  No, ma'am.

15  Q.  At what point in the search did he access that compartment?

16      We'll use for reference when you pull the grocery bag out of

17  the center console.  In reference to that -- we'll use that as a

18  point of reference -- was it before?  Was it after that?

19  A.  It was after that.

20  Q.  Okay.  And how long after that did that occur?

21  A.  I would say possibly five minutes, probably less.

22  Q.  Is that contained on the body cam videos, that discovery?

23  A.  Yes, ma'am.

24  Q.  Is it on yours, or is it on Deputy Seward's?

25  A.  It's on both.

1    Q.   Okay.  After the discovery of these items, at that point in

2    time, that's when you go back and Mirandize Mr. Christian;

3    correct?

4    A.   Yes, ma'am.

5    Q.   And just to make sure that I'm clear, that is the first time

6    that he is Mirandized on the scene; correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  You were asked earlier by Mr. Yurchisin about the

9    Simpson County Sheriff's Office's impound and towing policy.

10   And from my review of this policy, Simpson County doesn't have a

11   written policy that requires you to always search a stolen

12   vehicle; correct?

13   A.   Correct.

14   Q.   And it doesn't have a policy that you're always to search an

15   impounded vehicle; correct?

16   A.   Correct.

17   Q.   The policy is that you shall comply with search and seizure

18   requirements set by the courts; correct?

19   A.   Yes, ma'am.

20   Q.   Okay.  It doesn't specify which courts, whether those are

21   federal or state; correct?

22   A.   Correct.

23   Q.   And it doesn't set forth the scope of this search; correct?

24   A.   Correct.

25   Q.   And my understanding or my interpretation of it -- and tell

1   me if this is your interpretation of it -- you must either have

2   a warrant or the search must fall within an exception under the

3   law in order to search a stolen or impounded vehicle; correct?

4   A.  Yes, ma'am.

5           MR. YURCHISIN:  I'm going to object to that.  Asking

6   her to make a legal conclusion, I feel like, asking her whether

7   she has to have an exception or a search warrant.

8           THE COURT:  I believe she asked her understanding what

9   her authorization would be.

10          MS. BEYL:  Yes.

11  BY MS. BEYL:

12  Q.  And your understanding was that it would be either pursuant

13  to a warrant or a warrant exception; correct?

14  A.  Or like a probable cause search.

15  Q.  Yeah.

16  A.  Yes, ma'am.

17          MS. BEYL:  Your Honor, that's all the questions that I

18  have for now.

19          THE COURT:  Redirect?

20          MR. YURCHISIN:  Just a few things, Your Honor.  Thank

21  you.

22                      REDIRECT EXAMINATION

23  BY MR. YURCHISIN:

24  Q.  Thank you, Deputy.  I think you were asked a question about

25  did you find any evidence contradicting the defendant's story

1    about where he got the car, and you said you didn't find any; is

2    that right?

3    A.   Yes, sir.

4    Q.   Did you find any evidence supporting it inside the vehicle?

5    A.   I found that license plate from a possible Charlie.

6    Q.   But did that license plate come back to the vehicle?

7    A.   No, sir.

8    Q.   And when you ran it, did it come back to a different

9    vehicle?

10   A.   Yes, sir.

11   Q.   So how many license plates in total did you find with this

12   Acura?

13   A.   Two.

14   Q.   One was on the back; is that correct?

15   A.   Yes, sir.

16   Q.   And one was in the glove box?

17   A.   Yes, sir.

18   Q.   And did either of those come back to that car?

19   A.   No, sir.

20   Q.   You didn't ask for consent to search; right?

21   A.   No, sir.

22   Q.   Did you even ask him if he wanted his stuff out of the car?

23   A.   Yes, sir.

24   Q.   But when did you ask him?

25   A.   After he said -- he asked about his stuff.

1    Q.  And that's what I'm asking.  It's on the body cam, so the

2    Court will get to see it.  But in that interaction, did you ask

3    him if he wanted his stuff, or did he ask you first?  Who was

4    it?

5    A.  He asked for his stuff.

6    Q.  Okay.  And there was some questions about the body cam being

7    turned on when you went in the center console.  Did you turn it

8    on as soon as you went in the car?  Or explain that to the Court

9    just so there's no allegations or thoughts that maybe you had it

10   off.

11   A.  So originally whenever I got inside the vehicle, it was for

12   the owner's information as well as because of the smell of

13   marijuana.  When I first opened the vehicle, I believed it would

14   be a petty amount of marijuana, and once I found the suspected

15   illegal drugs and the amount that it was, I realized that it was

16   a lot more in depth than just a small amount of marijuana.

17   Q.  I think the better question is, did you know the camera was

18   off?

19   A.  I can't recall whether I knew for certain.

20   Q.  Okay.  But did you turn it on as soon as you found the

21   drugs?

22   A.  Yes, sir.

23   Q.  Once you smelled the marijuana, did that change the nature

24   of the case in your mind?

25   A.  It was still the stolen vehicle, and it was just possible

1   that there was marijuana inside the vehicle at that time.

2           MR. YURCHISIN:  Okay.  Nothing further, Your Honor.

3           THE COURT:  Any follow-up, Ms. Beyl?

4           MS. BEYL:  No, sir.

5           THE COURT:  All right.  Thank you, Deputy.

6       Any other witnesses for the prosecution?

7           MR. YURCHISIN:  Could I have just a few moments to

8   consult?

9           THE COURT:  Whatever you need.

10          MR. YURCHISIN:  Thank you, Your Honor.  Sorry about

11  that.  The United States would rest on the proof that's

12  provided.

13          THE COURT:  Does the defense wish to call any

14  witnesses?

15          MS. BEYL:  No, sir.

16          THE COURT:  All right.  So I presume the parties would

17  like to file post-hearing supplemental briefs.  Do the parties

18  want to jointly order the transcript?

19          MS. BEYL:  Yes, sir.

20          MR. YURCHISIN:  Yes, Your Honor.

21          THE COURT:  And how long after the transcript is

22  available would you like to have to file simultaneous briefs?

23          MR. YURCHISIN:  Could we have three weeks, Your Honor?

24          MS. BEYL:  How long do we think it's going to take for

25  the transcript?

1          THE REPORTER:  A couple weeks.

2          MS. BEYL:  Yes.  I'm just thinking.  I am out of town

3    the last week of August.  I just don't want to butt up against

4    that.

5          THE COURT:  I understand.  Whenever you-all want it is

6    fine with the Court.

7          MR. YURCHISIN:  I would recommend three weeks if

8    that's okay with Ms. Beyl.  It's just been my experience things

9    can come up in the meantime that may make getting it done in a

10   shorter period of time more difficult.

11         MS. BEYL:  That's falling right in the week that I'm

12   gone.  So, I mean, if I can have it due like four weeks after

13   instead of three, that would be a little bit better.

14         MR. YURCHISIN:  That's fine for the United States.

15         THE COURT:  That's what we'll do.

16      Okay.  Anything else we need to -- any other business we

17   need to attend to on the case?

18         MR. YURCHISIN:  Nothing from the United States.

19         MS. BEYL:  No, sir.

20         THE COURT:  Okay.  I will await your briefs then.

21   Thank you.

22         MS. BEYL:  Thank you.

23         MR. YURCHISIN:  Thank you, Your Honor.

24      (Proceedings concluded at 12:42 p.m.)

25

1                          C E R T I F I C A T E

2         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3     THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5         ____s/Terri L. Horton_____         _August 11, 2023____
      Terri L. Horton, RMR, CRR                Date
6     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               I N D E X

2    WITNESSES FOR THE GOVERNMENT:

3      DEPUTY SHAUNTEL MINCY

         Direct Examination by Mr. Yurchisin          3
4        Cross-Examination by Ms. Beyl               23
         Redirect Examination by Mr. Yurchisin       41

5

6

   GOVERNMENT EXHIBITS MARKED FOR IDENTIFICATION:

7

     Exhibit A - Body camera footage
8    Exhibit B - Body camera footage
     Exhibit C - Body camera footage
9    Exhibit E - Impounding and towing policy

10

   DEFENDANT EXHIBITS MARKED FOR IDENTIFICATION:

11

     Exhibit A - Photograph
12

13

14   Reporter Certificate                             46

15

16

17

18

19

20

21

22

23

24

25